Wood *v.* Savage.

Ross W. Wood and others *v.* Moses B. Savage and Sophia, his wife, Moses Savage, William Savage and Eurotas P. Hastings.

*Held,* that a *parol* ante-nuptial promise, by a husband, to hold money belonging to his wife at the time of marriage, as her trustee, and invest it in real estate in her name and for her separate use, could not be given in evidence to sustain a post-nuptial settlement upon the wife, as against creditors; such promise being founded solely upon the consideration of marriage, and therefore within the statute of frauds.  R. L. 1833, p. 342, § 10.*

*It seems,* that a voluntary post-nuptial settlement upon a wife, by a husband who was indebted at the time, is fraudulent and void as against existing creditors: And, that it is *prima facie* fraudulent, even as against subsequent creditors; but that, as against them, the presumption of fraud arising from the fact of indebtedness may be repelled by circumstances; as that the debts existing at the time were secured by mortgage, or in the settlement.  If the husband was not indebted at the time, the settlement will be valid unless actual fraud is shown.

Bill to reach and have applied to the payment of a judgment for $1873.67, which complainants had recovered against B. & W., partners, in November, 1838, a farm, of which the title was in B.'s wife and father.

The wife's title was this: She was married to B. in October, 1835: at the time, she had $1500 in money of her own; and it was agreed by *parol* between her and B., on the day preceding their marriage, that he should hold this money as her trustee, and invest it in real estate in her name and for her separate use, whenever a favorable opportunity offered; and a part of the money was then delivered to him, and the balance soon after the marriage.  In November, 1837, B. purchased for, and procured to be conveyed to his wife, with her assent, the undivided half of said farm; paying therefor $1050 out of the partnership funds of B. & W.  In June, 1839, a like purchase for, and conveyance to the wife of the other half of the farm, was consummated, for the consideration of $1500, of which B. paid $500 down, and the balance was secured by a mortgage executed by the wife, and notes which B. signed with her as surety.  At the time of the first purchase, the firm of B. & W. owed sundry debts which were not secured by mortgage or otherwise, but whether their indebtedness to the complainants then existed did not appear.

The only title of B.'s father, to the farm, was derived through a quit claim deed, executed to him by B. in 1840, in consummation of a purchase of B.'s interest, sup-

* See R. S. 1838, p. 330, § 2, and R. S. 1846, p. 326, § 2.

posed to be a life estate, made in good faith, and for a valuable consideration, but with full knowledge of all the facts.

*Held,* that, as to the complainants, the farm must be deemed the property of B. and subject to sale to satisfy their judgment against B. & W.

APPEAL from Chancery. For a report of the case in that court, see Walk. Ch. R. 471.

In November, 1838, the complainants recovered a judgment, upon bond and warrant of attorney dated the 27th day of June previous, against Moses B. and William Savage, as partners, for $1852.67 damages, and $21 costs, on which an execution was issued and returned unsatisfied. They then filed their bill in this case to reach and have applied to the payment of their debt, a certain farm in Washtenaw county, the legal title of which was in Sophia, the wife of Moses B. Savage, and in Moses Savage, his father.

The facts were substantially these: Moses B. and Sophia Savage were married in October, 1835, in New York, where Sophia then resided. She was at that time a widow, with one child, and having $1,500 of her own, mostly in cash, it was agreed by parol between her and Moses B. on the evening of the day preceding their marriage, that he should take this money, and, as her agent or trustee, invest it in real estate in Michigan, in her name and for her benefit, whenever a favorable opportunity offered; and a part of the money was then handed to him, and the balance a short time after the marriage. On the 27th of November, 1837, Moses B., with the assent of his wife, purchased for her the undivided half of the farm in controversy, of one Reighley, for $1,050, and paid for it out of the partnership funds of Moses B. and William Savage; and the deed was thereupon executed by Reighley directly to Mrs. Savage. On the 4th day of June, 1839, the other half of the farm, with her approbation and consent, was purchased for her, of one Phelps, for $1,500;

and a conveyance thereof was thereupon executed to her by Phelps. Of the purchase money, $500 was paid down, and the balance secured by a mortgage from her to Phelps, and her promissory notes signed by Moses B. as her surety; which notes and mortgage had not been paid at the time of the filing of the bill. At the time of the purchase from Reighley, the firm of Moses B. and William Savage owed sundry debts which were not shown to have been secured by mortgage or otherwise; but whether their indebtedness to the complainants then existed, did not appear in the case.

In May, 1840, Moses B. executed a quit claim deed of all his interest in the farm, supposed to be a life estate, to his father Moses Savage, who had knowledge of all the facts touching the title, for the consideration of $700, which was paid to him, and applied to the payment of his individual debts, and the debts of the firm of M. B. & W. Savage.

The bill charged that the purchases from Reighley and Phelps were in fact made by Moses B. Savage, and the conveyances taken in the name of his wife, for the purpose of defeating and defrauding his creditors; and that the conveyance by Moses B. to his father, Moses Savage, was made for a like purpose. The defendants answered severally, denying the fraud charged against them, and setting forth the facts above stated.

On the hearing before him, the Chancellor made a decree dismissing the complainants' bill; from which decree the complainants appealed to this court.

*A. D. Fraser* and *A. Davidson*, for the complainants. No authorities need be cited to show that the wife's money becomes the property of her husband by the marriage. And the settlement by the purchase of the Washtenaw farm, having been made long after the marriage, and after the marital rights of the husband to his wife's money

had attached, was a voluntary settlement; and the husband having been indebted at the time, it is fraudulent and void as to his creditors.   Post-nuptial settlements, where the husband was indebted at the time, have, in every instance, been declared fraudulent and void as against creditors.   *Reade* v. *Livingston*, 3 John. Ch. R. 492, 500 ; 4 Id. 450 ; *Saxton* v. *Wheaton*, 8 Wheat. 229 ; *Rundle* v. *Murgatroyd's assignees*, 4 Dall. 304 ; 12 Serg. & Rawle, 448 ; 3 Desau. R. 230 ; 2 Nott & McCord, 544 ; *Richardson* v. *Smallwood*, 4 Eng. Cond. Ch. R. 262.   It has been held that such a settlement is to be presumed fraudulent as against all existing debts, without regard to their amount, or the extent of the property settled, or the circumstances of the party.   1 Story's Eq. Jur. 350, 352, 354 ; *Randall* v. *Morgan*, 12 Ves. 74 ; 1 Bay's R. 173 ; 3 Desau. R. 233 ; 4 Id. 232 ; Ath. on Marr. Sett. 212 ; 2 Bro. C. C. 92.   The *parol* promise before the marriage, even if proved, will not support the settlement.   *Lavender* v. *Blackstone*, 2 Lev. 146 ; 1 Strange, 236 ; *Reade* v. *Livingston*, 3 John. Ch. R. 488 ; 1 Story's Eq. Jur. §374 ; 1 Eden, 55 ; *Izzard* v. *Izzard*, 1 Bail. (S. C.) Eq. R. 228 ; 1 Atk. 15 ; 2 Id. 511, 600 ; Sugd. on Powers, 422, '3 ; Ath. on Marr. Sett. 149 ; R. L. 1833, pp. 310, 342, 343, §§ 11, 113 ; R. S. 1338, p. 330, § 2, p. 332, § 2.

*Douglass & Walker*, for the defendants, cited Reeve's Dom. Rel. 176, 174 ; 2 P. Wms. 594 ; Clancy, 441, '6, 476, '7, '8 ; 6 Ves. 759 ; 17 Id. 171, '2 ; 9 Id. 193 ; 2 Id. 18 ; 3 John. Ch. R. 494 ; 2 Story's Eq. Jur. § 1370 ; 2 Paige, 303 ; *Taggard* v. *Talcott*, 2 Edw. Ch. R. 628.

GOODWIN, J. delivered the opinion of the Court.

[After some comments upon the doubtful and conflicting statements of Moses B. and Sophia Savage as to whether the agreement to invest the $1,500 of her money in real

estate for her sole use and benefit, was made before or after their marriage, the opinion proceeds :] Taking it then as established by the testimony of Moses B. Savage, that this agreement was made, and the money received in pursuance of it, anterior to the marriage, and that the purchase of the Washtenaw farm was made out of that fund, in fulfilment, in whole or in part, of the agreement and trust, the question arises, was that agreement valid, and will it support the transaction as against the complainants? And if that agreement by parol was not valid, and cannot be given in evidence against the complainants to sustain the transaction, then was the purchase of the farm valid as a settlement upon the wife, independently of the previous agreement?

It has long been the well established doctrine of courts of equity, that ante-nuptial agreements between the parties to a contemplated marriage, for the settlement of property upon the wife to her separate use, are valid and will be supported ; but it is insisted that the statute of frauds requires them to be in writing, and that if they are not so, subsequent settlements based upon them cannot be sustained.

Atherly, in his learned treatise on Marriage Settlements, says that it has been held that settlements after marriage are good against creditors and purchasers, though resting on mere parol agreements, *when such agreements were entered into before the marriage ;* but adds, that this doctrine has been called in question, and that he does not see how it can possibly be sustained ; for, to support the settlement, resort must be had to the parol agreement, and this can only be proved by parol evidence, and to admit parol evidence, in such a case, would be completely inconsistent with the spirit and design of the statute of frauds. p. 149. See also Sugd. on Powers, 421, '2, to the same effect. In the cases which arose before the

statute of frauds of Charles II., rendering void promises in consideration of marriage, not in writing, such agreements, and settlements in pursuance of them, were sustained.    Since that statute, the subject has been much discussed, and the cases do not seem to be altogether harmonious.    In *Montacute* v. *Maxwell*, 1 P. Wms. 618; S. C. 1 Str. 236, decided in 1720, the wife filed a bill to compel her husband to settle her own estate to her separate use, setting forth a parol promise before marriage : a plea of the statute of frauds of Charles II. was interposed and allowed.    The bill was amended, and allegations inserted to show fraud ; and thereupon a like plea directed to stand for an answer.    In the report of the case by Strange, is a *dictum* of the Lord Chancellor, that such parol agreement on marriage will support a settlement made in pursuance of it after marriage, and that it had been frequently so determined.    Sugden, in his treatise above cited, refers to this and says : "It is apprehended, however, that no such determination was ever made." In *Beaumont* v. *Thorp*, 1 Ves. 27, decided in 1747, a settlement by the husband upon the wife, after marriage, which was attempted to be supported upon a previous promise, was held a voluntary settlement against creditors.    No articles were recited in the settlement, and the case arose upon a bill filed by a creditor seeking to avoid it.    In *Spurgeon* v. *Collier*, Eden's R. 50, decided in 1758, the question arose in a different form, and was distinctly decided.    Collier settled an estate upon his niece and her husband, alleged to be in pursuance of an agreement made with the husband before and in consideration of the marriage.    This settlement was impeached by a creditor. The Lord Keeper decided that the original agreement was not proved ; and that if proved it would not better the case.    He remarked, that since the statute, the husband could have no remedy on the agreement ; and that in that

case "the settlement was voluntary, for it could not be compelled : it was made to a person having no right to demand, for where there is no remedy there is no right." And he adds, that "if such parol agreement could give effect to a subsequent settlement, it would be a dangerous blow to the statute." This view is equally applicable where the agreement is between the parties to the marriage: the danger and the mischief designed to be met and prevented by the statute are the same in either case. In *Dundas* v. *Dutens*, 1 Ves. 196, decided in 1790, Lord *Thurlow*, by an interrogatory to the Solicitor General, intimated that a settlement after marriage, *reciting a previous ante-nuptial parol agreement*, would be good ; the Solicitor General replying that he thought not. In another report of this case found in Cox's Cases, the Lord Chancellor is reported to have decided the question in favor of the settlement. What was the point actually decided seems to be left in some doubt. In *Randall* v. *May*, 12 Ves. 67, decided in 1806, the Master of the Rolls expressed the opinion that such a promise, though recited in the settlement, would not be good as against creditors. He states that there are cases to the contrary, and notices *Dundas* v. *Dutens*, and the intimation given by Lord *Thurlow*, but refers to the point as undecided. In *Reade* v. *Livingston*, 3 John. Ch. R. 481, Chancellor *Kent* reviews the authorities upon the subject and arrives at the conclusion, that where there is no recital of a previous ante-nuptial agreement, the settlement cannot be supported ; and expresses an opinion that even with such a recital, the reason and policy of the case, and the weight of authority are against it. He refers to all of the cases above cited except that of *Spurgeon* v. *Collier* which seems to have escaped his observation. In the case before us, no recital of any previous agreement appears, but it is a purchase made by the husband, and a conveyance thereupon made directly to

the wife.   Upon authority, then, I think the ante-nuptial agreement in this case clearly within the statute of frauds, (R. L. 1833, p. 342, § 10 ;) and I cannot see why it would not be so even if there were articles of settlement reciting it.   As against creditors it would be but the declararation of the parties to it ; and I cannot see how their after declaration of a previous alleged agreement can be more effectual against creditors in this form than in any other.   In either case, to establish it, resort must be had to proof; and this must be by parol, which is against the object and intent of the statute.   Justice *Story*, in treating of this subject in his Commentaries on Equity, § 374, says: " The strong inclination now seems to be, to consider such a settlement incapable of support from any evidence of a parol contract."   .

It is conceded that at the time of the alleged agreement, and also of the settlement, similar statutes of frauds were in force in New York and in this state : no question, therefore, as to the *lex loci,* arises.

It is said, however, that the wife's money, and not merely the marriage, constituted the consideration.   How so ?   Independently of the promise, this would, by the marriage, pass to the husband and become his.   He would be entitled to, and receive possession of it, as his own absolutely.   The effect of the agreement is, not to give him the possession, for that he would have without it, but to devest him of his marital right over it, and of all benefit from it.   In consideration of the marriage he agrees to part with the property conferred by the law as incident to it, and to make the settlement.   Suppose the money placed in the hands of a third person, instead of the husband, to invest for the wife's separate use.   If done before marriage, without the knowledge and consent of the proposed husband, it would be a fraud upon his marital rights, and would not affect them : the money would,

nevertheless, be his.    Suppose he, then, agrees with the proposed wife that a third person shall, as her trustee, invest it for her benefit : what is the consideration ?   Not the money : he has it not : that goes into the hands of the trustee for the wife's separate use.   The marriage, and that only, is the consideration.   How does the case differ when the husband himself receives the money under the agreement, and becomes the trustee ?   Only in this, that, in addition to his renouncing his marital rights over it, and personal benefit from it, he also assumes the burthen of the trust.   The fact that he does so, precludes that the money is the consideration.   She might decline the marriage and retain the money, unless he would consent to the proposed settlement.   If he does so consent, he, in consideration of the marriage, parts with a portion of the rights incident to it, which the law would otherwise confer upon him.

In the case of *Izzard* v. *Izzard*, 1 Baily's Eq. R. 228, decided in 1831, the court of appeals of South Carolina expressly applied the doctrine to a case where there was an alleged parol agreement before marriage to settle upon the wife her own personal property, holding a subsequent settlement void against creditors.

The case of *Taggart* v. *Talcott*, 2 Edw. Ch. R. 628, decided in New York by Vice Chancellor *McCoun*, in 1836, is cited by the defendants' counsel.   That case is, in some respects, analogous to the present, but in other respects it is different.   No question was made or arose in it, in regard to the statute of frauds.   The husband, in 1829, received from his wife's father $3945.00, and placed the same to the credit of the father on his books, with the understanding that it was to be her separate property, and all furniture purchased with it was to be carried to the account of this fund, as her sole property.   Household furniture was purchased with the money, and, upon a creditor's bill

against the husband, the wife petitioned to be protected in the enjoyment of the furniture as her separate property; and the petition was granted.   This, as I understand the case, was a gift, subsequent to the marriage, by the father of the wife, to her separate use : so placed by him in the hands of the husband.   Of course the husband was held, according to the principles of courts of equity, to be a trustee for the wife.   If the money had belonged to the wife at the time of the marriage, the question would have been different; and then, I think, the case would have been within the decision of Chancellor *Kent* in *Reade* v. *Livingston.*

The conclusion to which I have arrived, then, is that the parol agreement antecedent to the marriage, cannot be set up to support the transaction of 1837, as against creditors, and that, consequently, it must be considered unconnected with that agreement.

The next question, then, is, can this be supported as a settlement after marriage?   In other words, can a post-nuptial settlement, not founded on a previous ante-nuptial agreement, or any valuable consideration at the time of making it, be sustained against creditors ?   Upon this subject the law has been much considered and is well settled. It is that where the husband is indebted at the time of making the settlement, it is void as against both existing and subsequent creditors ; that either class of creditors may avoid it by showing that the settler was indebted at the time of making it, with the distinction, however, that in respect to subsequent creditors the presumption of fraud may be repelled by circumstances ; that, if the settler is not indebted at the time, the settlement is valid as against them, unless actual fraud appears, as by his thus devesting himself of his property with a view of contracting debts ; which would be clearly evinced by his shortly after incurring debts, and evading their payment.   The only

question which seems to remain in doubt or unsettled is, as to what circumstances will repel the presumption of fraud, where the settler was in debt at the time, and the settlement is sought to be avoided by subsequent creditors. .That the debts then owing were secured by mortgage, or in the settlement, have been held .to be such circumstances. As to what others are sufficient seems not to be precisely settled. The doctrine, as above stated, is laid down in Atherly on Marriage Settlements, and in Story's ·Commentaries on Equity in the chapter on constructive frauds, and it is fully sustained by the current of English, and generally by the American cases, many of which have been referred to by the appellants in their brief; and it seems to be so well settled that a particular reference to these cases is unnecessary. They are collected and reviewed by Chancellor *Kent* in his elaborate opinion in *Reade* v. *Livingston*, before cited, and by Chief Justice *Marshall* in *Saxton* v. *Wheaton*, 8 Wheat. 229; 5 Pet. Cond. R. 419. These cases have mostly arisen under the provisions of English and American statutes against fraudulent conveyances, affirmatory of the common law, and essentially like those contained in our statutes of 1833 and 1838·: and from the same authorities which establish the general doctrine, it is found that the creditor who seeks to avoid the settlement, must prove that the settler was indebted at the time he made it; and the settlement will prevail if it is left in doubt whether the debt of the creditor seeking to impeach its validity, was contracted anterior or subsequent to the settlement. Ath. on Marr. Set. 220; *White* v. *Sampson*, 3 Atk. 410; *Stephen* v. *Olive*, 2 Bro. Ch. Cas. 92.\*

---

\* The American authorities on the subject of voluntary conveyances, are collected and very ably reviewed, in a valuable work recently published, entitled American Leading Cases, (Vol. I. pp. 1—69.) On page 66 the authors say that " the rule *generally* established in this country, may be taken to be, that a voluntary post-nuptial settlement on a wife or children, will be good if the husband be not in debt at the time, or

Upon the facts presented in this case, how stands the transaction of November 22, 1837 ?  The judgment was rendered in November, 1838, upon a warrant of attorney executed in June of the same year.  The bill, as originally filed, merely set forth the judgment and execution upon it, but not the time of the creation of the debt.  Moses B. Savage answered, and after his answer the bill was amended so as to charge the several conveyances of the Washtenaw property to have been made subsequently to the indebtedness to the complainants, and with the intention of defrauding the complainants, and other creditors.  Moses B. made no further answer, and the amendments do not appear to have been taken *pro confesso* against him.  Mrs. Savage, in her answer, admits the judgment and execution, but is silent as to the allegation of the previous indebtedness.  When the answer is silent as to a fact alleged, which is charged to be within the personal knowledge of the defendant, or is of such a nature that it is presumed to be so, the fact is deemed admitted; otherwise not.  Now this fact is not charged as within the personal knowledge of Mrs. Savage, nor is it such a fact as will be presumed to be so, and therefore it cannot be regarded as admitted by her.  What then is the proof?  When the indebtedness accrued, the evidence does not show.  It appears from the examination of Moses B. that it existed in June, 1838, and that on the 27th of that month the warrant of attorney was executed; also, that Mr. Wood, one of the complainants, was in Monroe during that month, to see him in regard to it.  He states that at the time of a sale of property to his father, in May, 1838, judgment had not been rendered, or, as he recol-

the settlement be not disproportionate to his means, taking into view his debts and situation; in short, if it be *bona fide,* reasonable, and clear of any intent, actual or constructive to defraud.  *Picquet* v. *Swan,* 4 Mason, 444, 451; *Gassett* v. *Grout,* 4 Metc. 486, 488." *Reporter.*

lected, suit commenced.   For aught that appears the debt might have been contracted after November 22, 1837. Then, as to the other debts : From the whole of the testimony of Moses B., we think the conclusion is irresistible that he was indebted to sundry other creditors besides the complainants, at the time of the conveyance by Raleigh, although, through the inadvertence of counsel, doubtless, in not eliciting the facts fully on his examination, he does not state directly and expressly that he was so indebted. Is there any circumstance to repel the presumption of fraud arising from the fact of the existence of such indebtedness?   There is none.   There is no evidence to show that those debts were secured by mortgage, or otherwise ; indeed, we must infer from the facts in evidence that they were not.   It follows, then, that the settlement of November, 22, 1837, by the Raleigh purchase, is fraudulent in respect to creditors, and must be so held.

As to the purchase of Phelps in 1839, that was clearly void, under the first branch of the rule above stated relative to voluntary settlements ; as it was made after the complainants had obtained their judgment.

Now, as to the conveyance of the Washtenaw farm to Moses Savage in 1840.   First, in relation to the alleged fraud.   There are certainly some circumstances of suspicion.   Moses visited his son Moses B., at Monroe, in 1839, and must have acquired some knowledge of his indebtedness, though in his answer he denies any knowledge of the judgment in favor of the complainants.   After the purchase, Moses B. let the farm to Phelps, and received the proceeds, a part of which he applied in improvements upon the farm, and a part to his own use.   He also kept some stock upon it in conjunction with Phelps. He states that he acted as the agent of his father, and that what he reserved to his own use was not more than a compensation for his agency.   It is in proof, however,

that the sale was made to provide money for the payment of certain debts of Moses B., and that the consideration money was paid, and was in fact applied to the payment of those debts. It does not appear that the consideration was at all inadequate, even if Moses B. possessed, as was supposed, a life estate in the farm. A sale to pay creditors, with actual payment to them, can hardly be supposed to be fraudulent as to other creditors; and it appears to me that, with these facts, the circumstances of suspicion are not sufficient to authorize us to say that the sale was fraudulent.

But then the question arises, what interest did Moses B., the husband, convey on his own part, or on the part of his wife Sophia? It is insisted that the settlement was to her sole and separate use. If so, in equity, the husband's right over it would be devested, and the settlement, though invalid as it respects creditors, is valid as between the parties. The deeds to Mrs. Savage are not before us, and whether they are to her separate use on their face does not expressly appear; but from the answers and the testimony, such seems to have been the nature and character of the settlement. Now, what interest passed by the conveyance to Moses Savage? If the land was, as between the husband and wife, the separate property of the wife, and she was entitled to the usufruct, the conveyance passed only the husband's interest; and this would be nothing in equity, if it appeared on the face of the deed; and even if not, yet, upon the facts insisted upon by Moses B. and Sophia, it would be nothing; for if a legal life estate remained in him, it would yet, in equity, be in trust for her benefit, and only thus could Moses Savage take it: and all that was conveyed to and held by and for Mrs. Savage, is, under the principles we have adverted to, for the benefit of creditors, and would so pass to Moses Savage, if the trust appeared on the face of the deed,

or he had notice of it. Now, in his answer, he also sets up the same facts, but more briefly, insisted upon by Moses B. and Mrs. Savage, viz. that " Mrs. Savage had placed $1,500 of her own funds in the hands of her husband, in trust solely to be invested in real estate in Michigan for her benefit and in her name ;" and then, after stating that the land was purchased with these funds, he adds, "that the same was deeded to her directly, in furtherance and pursuance of said trust, and by her accepted in pursuance and fulfilment of said trust." He also goes on to state that he knew that the interest he purchased was only such as Moses B. held as the husband. Now, the parol agreement being void as against creditors, and all three of these defendants agreeing as to the fact that the land was held as above stated, if all the interest which Moses B. and his wife held, was, in respect to creditors, a trust for their benefit, then it follows that whatever interest, if any, Moses, the father, acquired by the deed of the husband, must be subject to the same trust. I have arrived at this conclusion with some hesitation. It appears to me the most difficult question of the case, and it was not fully presented on the argument. But if the land as between Moses B. and his wife was the wife's separate property, but subject to the claims of creditors, and the father took only as the husband held, (if he held any thing at all,) it seems to me that this is the necessary result.

The conclusion, then, is, that the decree of the Chancellor should be reversed, and a decree entered declaring the Washtenaw farm, in respect to creditors, the property of the defendant Moses B. Savage ; and that the right, title and interest held by him and his wife, and also that held by Moses Savage under the deed to him of May, 1840, be sold to satisfy the amount due upon the judgment of the complainants ; the sale of the undivided half

to be subject to the mortgage to Phelps for the purchase money.*

*Decree accordingly.*

* The facts and the opinion of the court relating to one branch of this case, which involved the question of the validity, as against the complainants, of a conveyance by Moses B. and William Savage to their father, Moses Savage, in May, 1838, of certain property in Monroe, have been entirely omitted in this report, as neither involving nor determining any legal principle; although the case as decided in the court of chancery, is reported in full in Walk. Ch. R. 471. As to this conveyance, the decree of the Chancellor sustaining its validity, was affirmed by this court.